UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEVEN REYNOLDS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-02152-JMS-MKB |
| | ) | |
| SAMUEL J. BYRD, KIM HOBSON, and CENTURION OF INDIANA, LLC, | ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Steven Reynolds was an incarcerated individual at Wabash Valley Correctional Facility ("WVCF")[1] and alleges that Defendants Samuel Byrd, Kim Hobson, and Centurion of Indiana, LLC ("Centurion") violated his constitutional rights by acting with deliberate indifference toward his medical needs after he was involved in a physical altercation and suffered an ankle fracture. Mr. Reynolds asserts an Eighth Amendment claim against all Defendants.[2] Defendants have filed a Motion for Summary Judgment, which is ripe for the Court's consideration. [Filing No. 69.] For the reasons discussed below, that motion is **GRANTED**.

**I.**
**STANDARD OF REVIEW**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party. *Khungar v. Access*

---

[1] Since the events underlying this lawsuit, Mr. Reynolds has been transferred to Miami Correctional Facility.

[2] The Court screened Mr. Reynold's Complaint pursuant to 28 U.S.C. § 1915A(a). [Filing No. 10.]

1

*Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017) (cleaned up). "Taking the facts in the light most favorable to the non-moving party does not mean that the facts must come only from the nonmoving party. Sometimes the facts taken in the light most favorable to the non-moving party come from the party moving for summary judgment or from other sources." *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Mr. Reynolds failed to respond to the summary judgment motion. Accordingly, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see also* S.D. Ind. L.R. 56-1(b) (party opposing summary judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.
### FACTUAL BACKGROUND

The facts stated below are presented by Defendants, supported by the record, and admitted by Mr. Reynolds for the purpose of summary judgment since he did not respond to Defendants' Motion for Summary Judgment.  S.D. Ind. L.R. 56-1(f).

### A.  Process of X-Rays at WVCF

"Once an x-ray is ordered by a physician or nurse [at WVCF], that order goes to the x-ray technician at WVCF, who is not an employee of Centurion."  [Filing No. 70-2 at 2.]  After an x-ray is ordered for an inmate, Centurion medical personnel, including Dr. Byrd and Ms. Hobson, do not have any ability or control over the timing of the ordered x-ray.  [Filing No. 70-2 at 2.]

### B.  Mr. Reynolds Is Involved in a Physical Altercation at WVCF

On April 27, 2022, Mr. Reynolds was involved in a physical altercation in or around his cell at WVCF.  [Filing No. 70-1 at 11-13.]  That same day, Mr. Reynolds saw Ms. Hobson, a nurse employed by Centurion at WVCF, and reported multiple injuries, including to his left ankle, face, and abdomen.  [Filing No. 70-1 at 11-13.]  Ms. Hobson observed that Mr. Reynolds' left ankle was swollen and bruised and contacted Dr. Byrd, a doctor employed by Centurion, for a consultation regarding further care for his left ankle.  [Filing No. 70-1 at 11-13; Filing No. 70-2 at 1.]

Dr. Byrd saw Mr. Reynolds the same day, April 27, 2022, and instructed Ms. Hobson to order three x-rays of Mr. Reynolds' left ankle, which was swollen and bruised, and to order crutches.  [Filing No. 70-1 at 13; Filing No. 70-2 at 2.]  Ms. Hobson ordered the three x-rays the same day.  [Filing No. 70-1 at 13.]

### C.  The X-Rays Reveal a Fracture

On May 6, 2022, the x-rays of Mr. Reynolds' left ankle were taken.  [Filing No. 70-2 at 2.] The x-rays revealed an "acute nondisplaced simple oblique fracture of the distal fibular shaft."

3

[Filing No. 70-1 at 198; Filing No. 70-2 at 2.] Dr. Byrd received the results of Mr. Reynolds' x-rays on May 10, 2022, and ordered that he receive a walking boot for six weeks that same day. [Filing No. 70-1 at 198; Filing No. 70-2 at 2.] Once Dr. Byrd gives an order to a nurse in response to an x-ray result, he "generally do[es] not have any role as a physician and Medical Director in enacting that order." [Filing No. 70-2 at 2.] Any failure to enact an order that Dr. Byrd "made in response to an x-ray would most likely be the result of an unintentional miscommunication among the medical staff." [Filing No. 70-2 at 2.]

### D.  Dr. Byrd Examines Mr. Reynolds During a Follow Up Appointment

On June 1, 2022, Dr. Byrd examined Mr. Reynolds during a follow up appointment in connection with the fracture in his left ankle. [Filing No. 70-1 at 14; Filing No. 70-2 at 3.] Mr. Reynolds told Dr. Byrd that he had not received a walking boot. [Filing No. 70-1 at 16; Filing No. 70-2 at 3.] Dr. Byrd was not aware at any time between May 10, 2022 and June 1, 2022 that Mr. Reynolds had not received the walking boot that he had ordered for him, and "[i]f [he] had been made aware . . . [he] would have acted to issue a walking boot to [Mr.] Reynolds at that time." [Filing No. 70-2 at 3.] Dr. Byrd issued a replacement walking boot to Mr. Reynolds during the appointment, and Mr. Reynolds received it that same day, along with pain medication. [Filing No. 70-1 at 16; Filing No. 70-2 at 3.] Dr. Byrd explained to Mr. Reynolds that the stabilization provided by the walking boot was necessary and was often sufficient to heal fractures like his without requiring surgery because "the fibula does little as it relates to weight bearing." [Filing No. 70-1 at 14; Filing No. 70-2 at 3.] Mr. Reynolds requested a second x-ray of his left ankle during the appointment, which Dr. Byrd ordered. [Filing No. 70-1 at 16; Filing No. 70-2 at 3.]

### E. The Second X-Ray Shows the Fracture Healing Normally

Mr. Reynolds was taken for a second round of x-rays on June 7, 2022. [Filing No. 70-1 at 200; Filing No. 70-2 at 3.] The x-rays revealed that Mr. Reynolds' "fracture was healing in a normal manner." [Filing No. 70-2 at 3; *see* Filing No. 70-1 at 200.]

### F. Dr. Byrd Examines Mr. Reynolds During a Second Follow Up Appointment

On June 23, 2022, Dr. Byrd examined Mr. Reynolds again in connection with his left ankle injury. [Filing No. 70-1 at 22-24; Filing No. 70-2 at 3.] During the appointment, Mr. Reynolds reported to Dr. Byrd that he had not been complying with Dr. Byrd's instruction to wear the walking boot. [Filing No. 70-1 at 22.] Mr. Reynolds also reported that he no longer had crutches and that they had been taken from him when he was taken to the Secured Housing Unit, which occurred at some point between receiving the crutches and the second follow up appointment. [Filing No. 70-1 at 22.] Dr. Byrd re-supplied crutches to Mr. Reynolds and again instructed him that he needed to wear the walking boot. [Filing No. 70-2 at 22-24.]

### G. Mr. Reynolds Is Seen by a Non-Party Nurse After Reports of Pain

On July 14, 2022, Mr. Reynolds reported pain and swelling in his left ankle and was seen by a non-party nurse. [Filing No. 70-1 at 29-32.] Mr. Reynolds was not utilizing the crutches given to him or the walking boot and so was given another pair of crutches during the visit. [Filing No. 70-1 at 31; Filing No. 70-1 at 36.] The nurse notified Dr. Byrd of the visit and of Mr. Reynolds' pain. [Filing No. 70-1 at 30.]

### H. Mr. Reynolds Is Seen for a Third Follow Up Appointment with Dr. Byrd

Dr. Byrd reexamined Mr. Reynolds again on July 28, 2022, and referred him to an outside orthopedic specialist because Mr. Reynolds "simply [would not] comply with conservative management." [Filing No. 70-1 at 35-36.] To refer an inmate to an outside provider, the doctor

submits an Offsite Provider Request ("OPR"), which is then reviewed and evaluated by Centurion's Regional Medical Director for approval. [Filing No. 70-2 at 4.] Physicians like Dr. Byrd do not have any authority or control over whether an OPR is approved or denied after submission or any involvement with the scheduling of any offsite medical treatment if the OPR is approved. [Filing No. 70-2 at 4.]

### I.  Mr. Reynolds Is Examined by an Orthopedic Specialist

The OPR that Dr. Byrd had submitted was approved, and Mr. Reynolds was examined by an orthopedic specialist, non-party Dr. Kurt Madsen, on September 9, 2022. [Filing No. 70-1 at 48-49; Filing No. 70-1 at 203.] Dr. Madsen recommended that Mr. Reynolds receive an MRI of his left ankle. [Filing No. 70-1 at 49; Filing No. 70-1 at 203.] Dr. Madsen did not recommend surgery at this visit. [*See* Filing No. 70-1 at 49; Filing No. 70-1 at 203.] Pursuant to the recommendation of Dr. Madsen, Dr. Byrd submitted a second OPR for Mr. Reynolds to receive an MRI of his left ankle. [Filing No. 70-1 at 48.]

### J.  Mr. Reynolds Receives a MRI of His Left Ankle

On October 7, 2022, Mr. Reynolds received an MRI of his left ankle, from which Dr. Madsen diagnosed a malunion of the fracture in Mr. Reynolds' left ankle. [Filing No. 70-1 at 205-07; Filing No. 70-2 at 4.] "[M]alunion can occur with any orthopedic fracture, even with proper treatment . . . ." [Filing No. 70-2 at 4.] Dr. Madsen recommended that Mr. Reynolds receive orthopedic surgery to resolve the fracture in his left ankle, and on October 10, 2022, Dr. Byrd submitted a third OPR requesting that Mr. Reynolds receive the recommended surgery. [Filing No. 70-1 at 66-67.] The OPR was approved, and Mr. Reynolds was scheduled for surgery. [Filing No. 70-2 at 4.]

### K.  Mr. Reynolds Receives Surgery

Mr. Reynolds' surgery was initially scheduled for October 31, 2022, but Mr. Reynolds cancelled the surgery on that date because he "refuse[d] to live in the infirmary" after the surgery. [Filing No. 70-1 at 212.]  Mr. Reynolds eventually requested a rescheduling of the surgery on November 26, 2022, and Dr. Byrd submitted a fourth OPR, which was approved.  [Filing No. 70-1 at 69-70.]  Mr. Reynolds ultimately received the surgery on January 4, 2023, and was placed in an air cast for several weeks thereafter.  [Filing No. 70-1 at 78-85; Filing No. 70-2 at 5.]  An x-ray of Mr. Reynolds' left ankle following surgery showed that there were no complications with the surgical repair.  [Filing No. 70-1 at 224.]  Mr. Reynolds did not report further issues with his left ankle in connection with the fracture after January 2023.  [Filing No. 70-2 at 5.]

### L.  This Lawsuit

After cancelling the surgery but before requesting a reschedule, Mr. Reynolds filed this *pro se* lawsuit on November 11, 2022.  [Filing No. 2.]  The Court screened Mr. Reynolds' Complaint pursuant to 28 U.S.C. § 1915A, and found that his Eighth Amendment deliberate indifference claims brought under 42 U.S.C. § 1983 against all Defendants would proceed.  [Filing No. 10.]  Mr. Reynolds alleges that Defendants were deliberately indifferent toward his medical needs by causing delay in medical care for his left ankle and that the fracture is not healing correctly and continuing to cause him pain.  [Filing No. 2.]  Defendants have filed a Motion for Summary Judgment.  [Filing No. 69.]

## III.
### DISCUSSION

At the outset, the Court notes that Mr. Reynolds did not respond to Defendants' Motion for Summary Judgment.  The Court could grant Defendants' Motion on that basis alone, S.D. Ind. L.R. 7-1(c)(5) ("[t]he court may summarily rule on a motion if an opposing party does not file a response

within the deadline"), but prefers to rule on the merits of motions and so will consider Defendants' arguments below.

  **A.  Claim Against Ms. Hobson**

Defendants argue that the evidence proves that Ms. Hobson was not deliberately indifferent to Mr. Reynolds' medical needs in connection with his left ankle. [Filing No. 71 at 10-12.] They highlight that Ms. Hobson treated Mr. Reynolds on the same day as the physical altercation that led to Mr. Reynolds' injuries and immediately called Dr. Byrd for a consultation. [Filing No. 71 at 11.] They argue that the record shows that Ms. Hobson was not involved in Mr. Reynolds' care after April 27, 2022, and that she did not have any control over the timing of Mr. Reynolds' x-rays. [Filing No. 71 at 11.] They assert that Ms. Hobson provided prompt care and that her "actions could not be considered negligent, let alone intentional wrongdoing demonstrating recklessness or a total lack of concern for [Mr.] Reynolds' welfare, as is necessary to support [his] deliberate indifference claim." [Filing No. 71 at 12.]

The Eighth Amendment "requires prisons to provide adequate medical care to prisoners." *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024) (citing *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021)). "Because depriving a prisoner of medical care serves no valid penological purpose, deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (quotations omitted, citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025).

"To prevail on a deliberate indifference claim, the plaintiff must prove (1) that he had an objectively serious medical condition (2) to which prison officials were 'deliberately, that is subjectively, indifferent.'" *Id.* (quoting *Johnson*, 5 F.4th at 824). The standard is not mere

8

negligence—it requires proof that the defendant knew of and disregarded an excessive risk of inmate health or safety or that they were aware of facts suggesting a substantial risk and consciously ignored it. *Jackson*, 105 F.4th at 961 (quotations and citations omitted); *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) ("[D]eliberate indifference requires more than negligence or even gross negligence.") (quotations omitted). "Even 'objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim.'" *Jackson*, 105 F.4th at 961 (quoting *White v. Woods*, 48 F.4th 853, 862 (7th Cir. 2022)). "Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)). Further, a defendant "must be personally responsible for a constitutional deprivation in order to be liable" in her individual capacity under § 1983. *Childress v. Walker*, 787 F.3d 433, 439 (7th Cir. 2015)

The Court assumes without deciding that Mr. Reynolds' left ankle injury qualifies as an objectively serious medical condition, thereby satisfying the first element of his claim. *Riley*, 126 F.4th at 1295. However, the claim ultimately fails at the second element because there is no record evidence that Ms. Hobson deliberately disregarded a substantial risk to Mr. Reynolds' health. On the contrary, the record shows that Ms. Hobson responded promptly—she evaluated Mr. Reynolds on the same day the injury occurred and immediately contacted Dr. Byrd for further assessment. Such prompt action is the antithesis of deliberate indifference. Moreover, the evidence confirms that Ms. Hobson had no control over the scheduling of x-rays and played no role in Mr. Reynolds' medical care beyond the initial visit on April 27, 2022. Since liability under § 1983 requires personal involvement in the alleged constitutional violation, and Ms. Hobson had no such involvement after April 27, 2022, the analysis as to her ends here.

The Court **GRANTS** Defendants' Motion for Summary Judgment as to Mr. Reynolds' Eighth Amendment deliberate indifference claim against Ms. Hobson.

**B.     Dr. Byrd**

Defendants argue that Dr. Byrd was not deliberately indifferent to Mr. Reynolds' medical needs at any point while treating him for his ankle fracture. [Filing No. 71 at 10-11.] They emphasize that Dr. Byrd examined Mr. Reynolds on the same day as the physical altercation, following Ms. Hobson's prompt consultation request, and that Dr. Byrd ordered both x-rays and crutches for him at that time. [Filing No. 71 at 11.] They argue that Dr. Byrd had no control over the timing of the x-rays and was unaware that Mr. Reynolds had not received the walking boot he later ordered. [Filing No. 71 at 11.] Defendants assert that it was not until Dr. Byrd reexamined Mr. Reynolds on June 1, 2022, that he became aware that Mr. Reynolds had not received the walking boot, at which point Dr. Byrd immediately issued a replacement walking boot. [Filing No. 71 at 11.] Defendants assert further that Mr. Reynolds did not submit any Request for Healthcare forms regarding his left ankle injury or regarding a walking boot during that time. [Filing No. 71 at 11 (citing Filing No. 70-1).] They argue that even if Dr. Byrd "could be considered deliberately indifferent for making sure [Mr.] Reynolds received his walking boot on an earlier date," the June 7, 2022 x-ray "demonstrated that [Mr.] Reynolds' ankle was healing well with no complications." [Filing No. 71 at 11.] Defendants contend that Mr. Reynolds' failure to comply with Dr. Byrd's direction to use the walking boot was the proximate cause of the later diagnosed malunion and highlight that Dr. Byrd submitted multiple OPRs for Mr. Reynold to be treated by an orthopedic specialist and took all necessary action to follow the recommendations for further treatment made by Dr. Madsen. [Filing No. 71 at 11-12.] They assert that Dr. Byrd provided prompt care and that his actions "could not be considered negligent, let alone intentional

10

wrongdoing demonstrating recklessness or a total lack of concern for [Mr.] Reynolds' welfare." [Filing No. 71 at 12.]

As with the analysis regarding Ms. Hobson, Mr. Reynolds' claim against Dr. Byrd fails at the second element. The evidence establishes that Dr. Byrd evaluated Mr. Reynolds on the same day as the physical altercation, at which time he ordered x-rays, crutches, and pain medication. Further, Dr. Byrd had no control over the timing of the x-rays, and the record shows that he was unaware that Mr. Reynolds had not received the walking boot he had ordered. Dr. Byrd cannot be held liable for a condition of which he had no knowledge. *Petties*, 836 F.3d at 728. Once Dr. Byrd became aware that Mr. Reynolds had not received the walking boot, he immediately provided a replacement. Moreover, Dr. Byrd promptly referred Mr. Reynolds to Dr. Madsen when his complaints of pain persisted and took all necessary steps to follow Dr. Madsen's recommendations. There is no evidence in the record that creates a genuine dispute of material fact regarding Dr. Byrd's treatment. In fact, the record does not even suggest negligence—much less the deliberate indifference required to support a constitutional violation.

The Court **GRANTS** Defendants' Motion for Summary Judgment as to Mr. Reynolds' Eighth Amendment deliberate indifference claim against Dr. Byrd.

C. **Claim Against Centurion**

Defendants "do not dispute that Centurion is a private company that has contracted to provide essential government services that would subject it to the same rules that apply to public entities under § 1983," but argue that that Mr. Reynolds has not "alleged or otherwise proven any set of facts that could support any claim of deliberate indifference against Centurion." [Filing No. 71 at 12-13.] They contend that "[d]espite naming Centurion as a Defendant, [Mr.] Reynolds did not assert any allegations in his Complaint specifically relating to Centurion or any systemic or

deficient policy, practice, or custom that he contends violated any constitutional right to support his claim against Centurion" and "has at no time provided any evidence of any such policy, practice, or custom." [Filing No. 71 at 13-14 (citing Filing No. 2).] Defendants assert that "[v]iewing the Complaint in a light most favorable to [Mr.] Reynolds, [he] at most alleges that Centurion improperly delayed his initial x-ray, which took place nine (9) days after the altercation, and delayed the issuance of a walking boot until June 1, 2022. However, these two alleged instances of delay alone are insufficient to show a widespread practice or custom that could support [Mr.] Reynolds' § 1983 claim against Centurion." [Filing No. 71 at 14 (citation omitted).] They argue further that the timing of an x-ray is controlled by an x-ray technician who is not a Centurion employee and that any delay with respect to Mr. Reynolds receiving a walking boot "was most likely the result of a miscommunication among the medical staff, which alone does not support a claim of deliberate indifference." [Filing No. 71 at 14 (citations omitted).] Defendants also assert that the evidence "proves that any harm [that] [Mr.] Reynolds alleged[ly] sustained was most likely caused by [his] failure to comply with Dr. Byrd's directions to wear [the] walking boot." [Filing No. 71 at 15 (citation omitted).]

Section 1983 liability can extend to local governing entities acting under the color of state law if the entity's official policies or widespread practice caused the deprivation of the alleged constitutional right. *Haro v. Porter Cnty., Ind.*, 129 F.4th 992, 996 (7th Cir. 2025) (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690-91 (1978)); *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (en banc) (entity liability under § 1983 is not limited to public entities, and "a private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities").

The critical question for § 1983 liability against an entity "is whether a municipal (or

12

corporate) policy or custom gave rise to the harm (that is, caused it)." *Glisson*, 849 F.3d at 379. This requires that the plaintiff "show that he was deprived of a federal right." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (quotation and citation omitted). "Beyond that, the plaintiff must trace the deprivation to some municipal action (i.e., a policy or custom), such that the challenged conduct is properly attributable to the municipality itself." *Id.* (quotation and citation omitted). "There are at least three types of municipal action that may give rise to municipal liability under § 1983: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* (quotation and citation omitted). "Inaction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action.'" *Id.* (quoting *Glisson*, 849 F.3d at 381). The plaintiff must then also show that the policy or custom was deliberately indifferent to plaintiff's constitutional rights, which "is a high bar," and show that the policy or custom was the cause of the violation of plaintiff's rights. *Dean*, 18 F.4th at 235 (citations and quotations omitted). In sum, a "plaintiff must show that some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation." *Id.* at 236.

Mr. Reynolds has neither demonstrated a constitutional deprivation nor alleged or produced any evidence that Centurion maintained a policy, practice, or custom that was unconstitutionally implemented. In fact, Mr. Reynolds' Complaint contains no specific allegations relating to Centurion or to any particular Centurion policy, custom, or practice. As best the Court can discern, the basis for this claim appears to be the delay in receiving initial x-rays and/or the delay in receiving a walking boot. However, as Centurion correctly notes, these isolated incidents—even

13

when combined—fall far short of establishing a widespread practice or custom sufficient to support a claim under § 1983. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (finding that even three instances of delayed prescriptions were insufficient to establish a widespread unconstitutional practice, particularly when based solely on the plaintiff's own experience); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (noting that *Monell* liability requires more than isolated incidents); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (finding that four incidents experienced only by plaintiff did not amount to a widespread practice). Because Mr. Reynolds has failed to offer evidence of any policy, practice, or custom by Centurion that deprived him of a federal right, the Court need not reach the remaining elements of this claim.

The Court **GRANTS** Defendants' Motion for Summary Judgment as to Mr. Reynolds' Eighth Amendment claim against Centurion.

## IV.
## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, [69]. Final judgment shall issue accordingly.

Date: 5/13/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

**Distribution via United States Mail to:**

STEVEN REYNOLDS
108390
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Inmate Mail/Parcels
3038 West 850 South
Bunker Hill, IN 46914-9810